**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DUNTAY CALDWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.  3:05-CV-796-F** |
| | ) | |
| **JIMMY ABBETT, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' SPECIAL REPORT

COME NOW Jimmy Abbett, Sheriff of Tallapoosa County, Alabama, and Orlando Jones, Defendants in the above-styled cause, and submit their Special Report to the Court.

## INTRODUCTION

On May 3, 2005, Plaintiff filed his Complaint in the United States District Court for the Northern District of Alabama.  That Court transferred the action to the United States District Court for the Middle District of Alabama on August 19, 2005.  On August 31, 2005, this Court ordered Defendants to file a Special Report within forty days of the date of the order.

On December 9, 2004, Plaintiff was arrested at the Montgomery County Jail on three charges of probation violation, two charges for failure to appear and two charges for failure to pay fines.  (Exhibit A, Inmate File of Duntay Caldwell, "Inmate File," Alabama Uniform Arrest Report dated December 9, 2004; Exhibit B, Inmate File, Orders; Exhibit C, Inmate File, Writs of Arrest.)  Plaintiff was booked in to the Tallapoosa County Jail that same day.  (Exhibit D, Inmate File, Tallapoosa County Jail In-Processing Check-List; Exhibit E, Inmate File, Inmate Summary; Exhibit F, Inmate File, Receipt for Property and Personal Use Items Issued and Receipt for Personal Property Stored.)  On April 7, 2005, Plaintiff's probation was revoked by the

Tallapoosa County Circuit Court. (Exhibit G, Inmate File, Conviction Reports; Exhibit H, Inmate File, Tallapoosa County Jail Court Action.) Plaintiff was released by the Tallapoosa County Jail into the custody of the Department of Corrections on May 6, 2005. (Exhibit I, Inmate File, Tallapoosa County Jail Out-Processing Check List; Exhibit J, Inmate File, Receipt for Personal Property Returned and Receipt for Property and Personal Use Items Returned.)

## PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that he (1) was placed in a cell with an inmate that he had gotten in a fight with before; (2) was sprayed with "pepper spray" during a second fight with that inmate; and (3) that he was denied medical care thereafter. (Plaintiff's Complaint, pp. 3-4.) Plaintiff states that he wants to file a class action civil lawsuit; he seeks damages in the sum of one hundred thousand dollars. (Plaintiff's Complaint, p. 4.)

## DEFENDANTS' RESPONSE TO PLAINTIFF'S ALLEGATIONS

Defendants deny the allegations made against them by Plaintiff as being untrue and completely without basis in law or fact. Defendants deny that they acted, or caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled. (Exhibit K, Affidavit of Jimmy Abbett, "Abbett aff." ¶ 5; Exhibit L, Declaration of Orlando Jones "Jones decl." ¶ 4.) Defendants raise the defenses of Eleventh Amendment immunity, qualified immunity, Plaintiff's failure to comply with the Prison Litigation Reform Act and additional defenses presented below. Defendants reserve the right to add additional defenses if any further pleading is required or allowed by the Court.

I.    **FACTS**

A.    **Policy and Procedure Regarding the Use of O.C. Spray**

It is the policy of the Tallapoosa County Jail that the use of physical force against an inmate will be permitted only when the safety and security of the institution is seriously threatened and when no reasonable alternatives are available.  (Exhibit M, Affidavit of Blake Jennings, "Jennings aff." ¶ 4.)  It is the policy of the Tallapoosa County Jail that jail officials are only to use physical force in five (5) situations:  (1) self-defense; (2) defense of third persons; (3) prevention of a crime; (4) prevention of escape; and (5) enforcement of the Tallapoosa County Jail Rules.  Physical force should be used only to that degree necessary under the facts and circumstances of the individual situation.  Following any use of force in the Tallapoosa County Jail, a detailed incident report will be completed by each officer involved and forwarded to the Sheriff.  (Jennings aff. ¶ 4.)

It is recognized by the Tallapoosa County Jail that the use of chemical agents is one of the least amounts of force one can use.  (Jennings aff. ¶ 5.)  It is the policy of the Tallapoosa County Jail that the use of chemical dispensers to aid in subduing an inmate(s) will be permitted only when the safety and security of the jail is threatened and when the inmate(s) cannot be approached without danger to himself/themselves or to others.  (Jennings aff. ¶ 6.)  It is the policy of the Tallapoosa County Jail that any staff member using chemical dispensers must have completed training on chemical aerosol spray.  Unless in an emergency type situation, the only type of chemical spray to be used in he jail is O.C. spray which will be furnished by the jail.  The jail furnishes 10% O.C. spray in four ounce cans or dispensers.  (Jennings aff. ¶ 7.)  In the event that the administration of O.C. spray is necessary, the inmate will immediately thereafter be

provided with cold water with which to flush his eyes.  If O.C. spray is used in the confines of the jail, the affected area of the jail should be cleaned as soon as practicable.  (Jennings aff. ¶ 8.)

**B.      Facts Surrounding the Incident on April 28, 2005.**

On the evening of April 28, 2005, while on duty at the Tallapoosa County Jail, Officer Orlando Jones and Sergeant Jason Cowart were informed via the intercom system that there was about to be a fight in Duntay Caldwell's cell.  (Jones decl. ¶ 5; Exhibit N, Declaration of Jason Cowart, "Cowart decl.", ¶ 4; Exhibit O, Inmate File, Jail Log dated April 28, 2005.)  Therefore, the two officers along with former Officer Jeaniffer Hines proceeded to C-7, the cell to which Caldwell was assigned.  (Jones decl. ¶ 6; Cowart decl. ¶ 5.)  Officer Jones was the first officer to enter the cell.  (Jones decl. ¶ 7; Cowart decl. ¶ 6.)  As the officers entered the cell, they saw Caldwell and another inmate JaMichael Hart engaged in a fist fight.  (Jones decl. ¶ 7; Cowart decl. ¶ 6; Exhibit O.)  Officer Jones gave the inmates verbal commands to stop and to break it up. (Jones decl. ¶ 7; Cowart decl. ¶ 7; Exhibit O.)  However, the inmates continued punching each other.  (Jones decl. ¶ 7; Cowart decl. ¶ 7.)  As they were fighting, the inmates moved toward a table in the room, and it appeared that one of them might get injured.  (Cowart decl. ¶ 7.) Because of the intensity of the fight, the officers were concerned for the inmates' safety as well as for the overall security of the jail.  (Jones decl. ¶ 9; Cowart decl. ¶ 8.)  After Officer Jones' verbal commands were ignored by both inmates, he administered one spray of O.C. to the inmates.[1]  Caldwell and Hart stopped fighting instantly.  (Jones decl. ¶ 10; Cowart decl. ¶ 9; Exhibit O.)

Officer Jones used only the minimum degree of force necessary in this situation.  (Jones decl. ¶ 11; Cowart decl. ¶ 10.)  After the inmates were sprayed with O.C., the inmates were

---

[1] Officer Orlando Jones successfully completed a course of instruction in the care and use of Oleoresin Capsicum (O.C.) Spray.  (Exhibit P, Certificate of Completion; Exhibit L ¶ 2.)

immediately taken to separate halls and allowed to shower.  The inmates were then placed in

cells on separate halls.  The cell that they were previously assigned to was cleaned thoroughly.

(Jones decl. ¶ 12; Cowart decl. ¶ 11; Exhibit O.)  Neither inmate was injured during this incident.

(Cowart decl. ¶ 12; Exhibit O.)  Both inmates were offered medical treatment, and both refused.

(Cowart decl. ¶ 13.)

Before this fight, Caldwell had never asked Officer Jones, Sergeant Cowart, or Sheriff

Abbett to separate him from Hart, and they were not aware that Caldwell and Hart had had any

problems or fights with one another.  (Jones decl. ¶ 14; Cowart decl. ¶ 14; Abbett aff. ¶ 4.)  In

fact, after this incident, Caldwell and Hart informed Officer Jones and Sergeant Cowart that they

are cousins.  (Jones decl. ¶ 14; Cowart decl. ¶ 14.)  Plaintiff and Hart were charged with a

disciplinary violation for fighting.  (Exhibit Q, Disciplinary Records for Plaintiff and Hart, Jail

Logs dated April 28, 2005.)  Caldwell was released to the Department of Corrections before a

disciplinary hearing could be held.  (Exhibit Q, Disciplinary Records for Plaintiff and Hart, Jail

Log on Plaintiff dated October 5, 2005.)  Hart waived his right to a hearing and acknowledged

guilt of misconduct as charged.  (Exhibit Q, Disciplinary Records for Plaintiff and Hart, Pending

Disciplinary Action on Hart dated May 27, 2005, Jail Log on Hart dated October 5, 2005.)

Neither these officers nor Jail Administrator Jennings ever received a grievance from Caldwell

concerning this incident.  (Jones decl. ¶ 15; Cowart decl. ¶ 15; Jennings aff. ¶ 9.)

### C.    Plaintiff's Medical Care and Treatment at the Tallapoosa County Jail

On December 22, 2004, Nurse Angela Webb took Plaintiff's Medical history.  (Exhibit

R, Inmate Medical File of Duntay Caldwell, Progress Notes dated December 22, 2004.)  The

Nurse noted that Plaintiff has an anger management problem and that he was on Thorazine for

this problem while in Kilby prison.  (Exhibit R.)  Nurse Webb also noted that Plaintiff had a

negative tuberculosis test two prior to coming to the Tallapoosa County Jail and had had blood

work done one month prior to coming to the Tallapoosa County Jail.  (Exhibit R.)

On January 6, 2005, Plaintiff saw the Nurse for complaints of stomach pain.  (Exhibit R,

Inmate Medical File, Progress Notes dated January 6, 2005.)  Plaintiff told Nurse Webb that he

had had surgery years ago and could not have a bowel movement.  (Exhibit R.)  Therefore, Nurse

Webb referred him to Robert Schuster, MD.  (Exhibit R; Exhibit S, Inmate File, Daily Check

Logs.)   After Dr. Schuster evaluated Plaintiff, he prescribed him Prilosec for his condition.

(Exhibit R; Exhibit S; Exhibit T, Inmate Medical File, Medications/Physicians Orders dated

January 6, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated

January 7, 2005.)  The next day Plaintiff continued to complain of abdomen pain.  (Exhibit R,

Inmate Medical File, Progress Notes dated January 7, 2005.)  Plaintiff stated that he was unable

to eat.  Therefore, he was moved to the medical observation cell and placed on a bland diet.

(Exhibit R; Exhibit S, Inmate File, Daily Check Logs.)

On January 10, 2005, Plaintiff told Nurse Webb that his pain had not improved and that

he still could not eat.  (Exhibit R, Inmate Medical File, Progress Notes dated January 10, 2005.)

Nurse Webb notified Dr. Schuster who gave new orders for Plaintiff.  (Exhibit R; Exhibit T,

Inmate Medical File, Medications/Physicians Orders dated January 10, 2005; Exhibit U, Inmate

Medical File, Medication Administration Record dated January 7, 2005.)  Dr. Schuster increased

Plaintiff's Prilosec and prescribed Carafate for him.   (Exhibit T, Inmate Medical File,

Medications/Physicians Orders dated January 10, 2005 Exhibit U, Inmate Medical File,

Medication Administration Record dated January 7, 2005.)  The next day Plaintiff told Nurse

Webb that he still did not feel better.  (Exhibit R, Inmate Medical File, Progress Notes dated

January 11, 2005.)    Therefore, Nurse Webb continued to monitor Plaintiff in the medical observation cell.  (Exhibit R; Exhibit S, Inmate File, Daily Check Logs.)

Dr. Schuster saw Plaintiff again on January 13, 2005, ordered blood work, and prescribed new medications for him.  (Exhibit R, Inmate Medical File, Progress Notes dated January 13, 2005; Exhibit T, Inmate Medical File, Medications/Physicians Orders dated January 13, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated January 7, 2005; Exhibit V, Inmate Medical File, Records from Lake Martin Community Hospital dated January 2005.)  The next day Plaintiff told Nurse Webb that he felt better.  (Exhibit R, Inmate Medical File, Progress Notes dated January 14, 2005.)  On January 17, 2005, Plaintiff informed Nurse Webb that he was still feeling better and was able to eat more.  (Exhibit R, Inmate Medical File, Progress Notes dated January 17, 2005.)  He was therefore moved out of medical observation. (Exhibit R; Exhibit S, Inmate File, Daily Check Logs.)  On January 19, 2005, Nurse Webb received the results from Plaintiff's blood work and called them in to Dr. Schuster.  (Exhibit R, Inmate Medical File, Progress Notes dated January 19, 2005; Exhibit V Records from Lake Martin Community Hospital dated January 2005.)  On January 21, 2005, she faxed the results to Dr. Schuster who called with new orders.  (Exhibit R, Inmate Medical File, Progress Notes dated January 21, 2005; Exhibit T, Inmate Medical File, Medications/Physicians Orders dated January 21, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated January 7, 2005 and February 1-February 28, 2005; Exhibit W, Fax Cover Sheet and Confirmation Sheet dated January 21, 2005.)  Nurse Webb called the prescription in to the drug store.  (Exhibit R, Inmate Medical File, Progress Notes dated January 21, 2005.)

On February 1, 2005, the new Jail Nurse, Cathy Dubose, started Plaintiff on Preparation H for rectal bleeding from hemorrhoids.  (Exhibit R, Inmate Medical File, Progress Notes dated

February 1, 2005; Exhibit T, Inmate Medical File, Medication/Physician Orders dated February 1, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated February 1-February 28, 2005, March 1-March 31, 2005, April 1-April 30, 2005, and May 1-May 31, 2005.) Plaintiff was seen by Dr. Schuster on February 3, 2005, for complaints of his persistent upper abdomen pain, itchy scalp and right external ear, and a knot on the back of his neck. (Exhibit R, Inmate Medical File, Progress Notes dated February 3, 2005.) Dr. Schuster prescribed a medicated shampoo for Plaintiff and ordered an appointment with Greg Gilbert, MD. (Exhibit R; Exhibit T, Inmate Medical File, Medications/Physician Orders dated February 3, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated February 1-February 28, 2005.) On February 11, 2005, Plaintiff again saw Dr. Schuster for complaints of abdomen pain. (Exhibit R, Inmate Medical File, Progress Notes dated February 11, 2005.) Dr. Schuster noted that Plaintiff was anxious and depressed but did not exhibit suicidal tendencies. (Exhibit R.) Plaintiff was prescribed Prilosec and an antidepressant by the doctor. (Exhibit R; Exhibit T, Inmate Medical File, Medications/Physician Orders dated February 11, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated February 1-February 28, 2005, March 1-March 31, 2005, April 1-April 30, 2005, and May 1-May 31, 2005.)

On March 2, 2005, Nurse Dubose prescribed Ibuprofen for the Plaintiff for pain after his tooth broke off. (Exhibit R, Inmate Medical File, Progress Notes dated March 2, 2005; Exhibit T, Inmate Medical File, Medications/Physician Orders dated March 2, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated March 1-March 31, 2005 and April 1-April 30, 2005.) On March 3, 2005, Nurse Dubose noted that Plaintiff had an appointment with Dr. Gilbert for February 29, but Coosa County had picked the Plaintiff up for court. (Exhibit R, Inmate Medical File, Progress Notes dated March 3, 2005.) Therefore, she rescheduled

Plaintiff's appointment for March 28, 2005.  (Exhibit R.)  On March 8, 2005, Plaintiff presented to Nurse Dubose with complaints of a headache.  (Exhibit R, Inmate Medical File, Progress Notes dated March 8, 2005.)  He told Nurse Dubose that his mother had had surgery the day before and he had not heard from her.  (Exhibit R.)  Nurse Dubose noted that Plaintiff was suffering from a cold and anxiety.  (Exhibit R.)  The Nurse prescribed Sudogest for Plaintiff. (Exhibit T, Inmate Medical File, Medications/Physicians Orders dated March 8, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated March 1-March 31, 2005.)

On April 11, 2005, Plaintiff was taken to see Dr. Gilbert at Lake Martin Community Hospital.  (Exhibit R, Inmate Medical File, Progress Notes dated April 11, 2005; Exhibit X, Inmate Medical File, Records from Lake Martin Community Hospital dated April 2005.)  Dr. Gilbert prescribed Protonix for Plaintiff and ordered an Upper GI and Barium Swallow.  (Exhibit T, Inmate Medical File, Medication Administration Record dated April 1-April 30, 2005 and May 1-May 31, 2005; Exhibit X, Inmate Medical File, Records from Lake Martin Community Hospital dated April 11, 2005, Outpatient Record and Prescription; Exhibit Y, Inmate Medical File, Records from East Alabama Medical Center dated April 15, 2005, Outpatient Physician Orders.)  On April 15, 2005, Plaintiff was taken to East Alabama Medical Center for an upper GI and barium swallow.  (Exhibit R, Inmate Medical File, Progress Notes dated April 15, 2005; Exhibit Y, Inmate Medical File, Records from East Alabama Medical Center dated April 2005.) Nurse Dubose called Dr. Gilbert's Nurse on April 21, 2005, and asked her to fax the results of Plaintiff's tests to the jail for Dr. Schuster to review.  (Exhibit R, Inmate Medical File, Progress Notes dated April 21, 2005.)  The next day Nurse Dubose received the report *which showed no abnormality*.  (Exhibit R, Inmate Medical File, Progress Notes dated April 22, 2005; Exhibit Y,

Inmate Medical File, Records from East Alabama Medical Center dated April 15, 2005, Diagnostic Radiology Results; Exhibit Z, Fax Cover Sheet dated April 21, 2005.)

On May 4, 2005, Plaintiff saw Dr. Schuster and was treated for a bite and an injury to his hand that were sustained in a fight. (Exhibit R, Inmate Medical File, Progress Notes dated May 4, 2005.) Dr. Schuster ordered a Tetanus Toxoid injection, a splint, and a consultation with an orthopedic doctor. (Exhibit R, Inmate Medical File, Progress Notes dated May 4, 2005; Exhibit T, Medications/Physician Orders dated May 4, 2005.) Nurse Dubose administered the Tetanus Toxoid with no adverse reaction. (Exhibit R, Inmate Medical File, Progress Notes dated May 4, 2005; Exhibit T, Medications/Physician Orders dated May 4, 2005; Exhibit U, Inmate Medical File, Medication Administration Record dated May 1-May 31, 2005.) Dr. Schuster also ordered an X-ray of Plaintiff's hand. (Exhibit T, Inmate Medical File, Medications/Physician Orders dated May 4, 2005.) The next day Nurse Dubose made an appointment with Dr. Whatley in Dadeville for evaluation of Plaintiff's right hand swelling. (Exhibit R, Inmate Medical File, Progress Notes dated May 5, 2005.) However, the next day, Plaintiff was released to the Department of Corrections. (Exhibit R, Inmate Medical File, Progress Notes dated May 6, 2005; Exhibit I; Exhibit J.)[2]

## II.    LAW

### A.    All claims by Plaintiff against Defendants in their official capacities must fail based on Eleventh Amendment immunity and because they are not "persons" under 42 U.S.C.A. § 1983.

Plaintiff's claims against Defendants in their official capacities are due to be dismissed for lack of subject matter jurisdiction; as such claims are barred by the Eleventh Amendment to the United States Constitution. <u>Parker v. Williams</u>, 862 F.2d 1471, 1476 (11th Cir. 1989)

---

[2] The remainder of Plaintiff's Inmate File and Inmate Medical File not previously identified as separate exhibits is attached hereto as Exhibit AA. For the purpose of certification of the Plaintiff's Inmate Medical File, the Affidavit of Cathy Dubose, the Jail Nurse, is attached hereto as Exhibit BB.

(holding a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989) (holding that a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); Carr v. City of Florence, Ala., 918 F.2d 1521, 1525 (11th Cir. 1990) (holding a deputy sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); Lancaster v. Monroe County, 116 F.3d 1419, 1430-31 (11th Cir. 1997) (extending Eleventh Amendment immunity to include jailers employed by county sheriffs).

In addition, the official capacities claims must fail because 42 U.S.C.A. § 1983 prohibits a person, acting under color of law, from depriving another of his rights secured by the United States Constitution.  42 U.S.C.A. § 1983 (emphasis added).  The United States Supreme Court has held that state officials, in their official capacities, are not "persons" under § 1983.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).  Any claims against Defendants in their official capacities should therefore be dismissed because they are not "persons" under § 1983 and therefore claims against them in their official capacities fail to state a claim upon which relief can be granted.  Id.; Carr v. City of Florence, Ala., 916 F.2d 1521, 1525 n.3 (11th Cir. 1990).

**B.    Plaintiff's failure to comply with the Prison Litigation Reform Act bars the Complaint.**

**1.    Plaintiff has failed to exhaust all Administrative Remedies.**

Under the Prison Litigation Reform Act ("PLRA"), an inmate is required to exhaust all administrative remedies before instituting an action under 42 U.S.C. § 1983.  42 U.S.C. § 1997e(a).  The Plaintiff in this case has not utilized two separate and distinct administrative remedies available to him.  First, the Plaintiff has not exhausted the grievance procedures provided at the Tallapoosa County Jail.  Secondly, he has not alleged that he pursued any

grievance through the State Board of Adjustment.  See Brown v. Tombs, 139 F.3d 1102, 1103-04 (6th Cir. 1998) (requiring prisoners to affirmatively show that they have exhausted administrative remedies).  Neither Jail Administrator Jennings nor either Defendant recalls a grievance being filed by Plaintiff in regards to the allegations made the basis of his Complaint.

In addition to the grievance procedure at the local level, Alabama law provides the opportunity to file a claim and proceed before the State of Alabama Board of Adjustment pursuant to Ala. Code § 41-9-60.  The Sheriff of Tallapoosa County, as are his alter egos, is a state officer and therefore would be entitled to sovereign immunity.  See Lancaster v. Monroe County, 116 F.3d 1419, 1429 (11th Cir. 1998).  Due to this immunity, the State of Alabama has provided an administrative remedy for the recovery of money damages through the State of Alabama Board of Adjustment.

As a result of Plaintiff's failure to exhaust these two remedies, he is barred from bringing this action under § 1997e(a).  See Alexander v. Hawk, 159 F.3d 1321, 1326-27 (11th Cir. 1998) (affirming dismissal of prison action due to failure to exhaust administrative remedies).

> **2.    Plaintiff's claims are barred by the Prison Litigation Reform Act because he has not suffered any physical injury as a result of the allegations in his Complaint.**

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . .  In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis."  Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309 (11th Cir. 2002).  There is no record that Plaintiff made any medical request or that Plaintiff saw the

Jail Nurse in reference to this incident. Because Plaintiff has not made a showing of physical injury that is greater than de minimis, his complaint is due to be dismissed.

> **C.    Alternatively, Defendants are entitled to summary judgment based on qualified immunity because nothing in their conduct crossed a "bright line" contour of clearly established constitutional law.**

Public officials, like Defendants here, are protected in their individual capacities by qualified immunity as long as "a reasonable officer could have believed [his actions] to be lawful, in light of *clearly established law* and the information [that the officer] possessed." Anderson v. Creighton, 483 U.S. 635, 636 (1987) (emphasis added). The Eleventh Circuit Court of Appeals has observed, "[t]hat qualified immunity protects governmental actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their *individual capacities*." Lassiter v. Alabama A & M Univ., 28 F.3d 1146 (11th Cir. 1994) (en banc) (emphasis in original) (footnote omitted).

Our circuit has divided consideration of qualified immunity into two "prongs" of analysis as articulated in Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir. 1983).

> First, "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Sammons v. Taylor, 967 F.2d 1533, 1539 (11th Cir. 1992) (quoting Zeigler, 716 F.2d at 849). "[T]hen the burden shifts to the plaintiff to demonstrate that the defendant violated clearly established constitutional law." Id. (quoting Zeigler, 716 F.2d at 849).

Jordan v. Doe, 38 F.3d 1559, 1565 (11th Cir. 1994).

Once it is established that the Plaintiff has stated a claim and that the Defendants were acting within their discretionary authority, the Court then considers whether the contours of the constitutional right allegedly violated were "clearly established." In making this assessment, the reviewing court must examine the state of law *at the time the alleged deprivation occurred*. See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994); Adams v. St. Lucie County Sheriff's Dep't,

962 F.2d 1563, 1578 (11th Cir. 1992) (Edmondson, J., dissenting), rev'd and reasoning of original dissent adopted, 998 F.2d 923 (11th Cir. 1993) (en banc).

Not only must the "clearly established" law pre-date the subject incident, the law must be relatively "fact specific" and "so particularized" that it would have been obvious or "apparent" to the defendant that his actions were unlawful.  See Rodgers, 39 F.3d at 311; Hansen v. Soldenwagner, 19 F.3d 573, 575 (11th Cir. 1994) (both reversing denial of qualified immunity).  As the Eleventh Circuit has explained, "[a] plaintiff cannot rely on . . . 'broad legal truisms' to show that a right is clearly established. . . . '[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'"  Kelly v. Curtis, 21 F.3d 1544, 1550 (11th Cir. 1994) (reversing denial of qualified immunity as to some defendants) (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1992)).  While the facts of prior cases establishing the law in a particular context need not be identical, they must be at least "materially similar."  Adams, 862 F.2d at 1575 (Edmondson, J., dissenting) (approved en banc, 998 F.2d 923). This case law must "dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  Id. at 1150.

The evidence clearly shows that Defendants have done nothing to cross any bright line of clearly established constitutional law.  Therefore, they are entitled to qualified immunity.

### 1.    Failure to Protect Claim

"[N]ot . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  Farmer v. Brennan, 511 U.S. 825, (U.S. 1994). A jail officer only violates the Eighth Amendment when two conditions are met:  (1) the inmate must show "that he is incarcerated under conditions

posing a substantial risk of serious harm" and (2) "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 834 and 837. Where the inmate had not requested protection from the other inmate involved and where the officer had no knowledge of a threat prior to the injury, a plaintiff's failure to protect claim must fail. Carter v. Galloway, 352 F.3d 1346, 1350-1351 (11th Cir. 2003). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Farmer v. Brennan, 511 U.S. 825, 838 (U.S. 1994).

In the instant case, Plaintiff has not shown that being in the same cell with JaMicheal Hart presented a substantial risk of serious harm, nor can he show that either Defendant was aware of any such risk. Neither Defendant had knowledge of any prior altercations between Plaintiff and Hart, and Plaintiff had never asked either Defendant to separate him from Hart. Because Plaintiff has not shown that Defendants were deliberately indifferent to a substantial risk of serious harm, his claim for failure to protect must fail.

### 2.    Excessive Force Claim

The seminal case regarding judicial inquiry into an excessive force claim against a prison official was set forth in Whitley v. Albers, 475 U.S. 312, 320-21 (1984) and establishes as the appropriate query "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." See Hudson v. McMillan, 503 U.S. 1, 6-7 (1992). In fact, the Whitley Court reasoned that:

> Corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmate. . . .  Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Id. at 6 (citations omitted).  The factors to be considered in evaluating whether the use of force was wanton and unnecessary include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate.

In evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment.  Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).  Where the only question concerns the reasonableness of the force used by a prison official, the defendants should be entitled to judgment as a matter of law.

Plaintiff and another inmate were engaged in a fist fight.  Neither Plaintiff nor the other inmate stopped fighting even after Officer Jones repeatedly ordered them to stop.  Officer Jones as well as the other officers present were concerned for the inmates' safety as well as for the overall security of the jail. Additionally, the record indicates the Plaintiff suffered no serious injury.  He was offered medical attention and refused it.  The minimal force used by Officer Jones was in good faith, was intended to restore order, and was not used maliciously or sadistically for the purpose of causing harm.  Accordingly, Defendant Jones is not liable for the use of excessive force.

The application of *de minimis* force in making an arrest, without more, will not support a claim for excessive force in violation of the Fourth Amendment.  Nolin v. Isbell, 207 F. 3d 1253, 1256 (11th Cir. 2000).  The force used by the officers (i.e. the use of pepper spray) was clearly *de minimis*.  In analyzing the *de minimis* use of force in Fourth Amendment claims, the Eleventh Circuit has either affirmed the grant of summary judgment based on qualified immunity or reversed

the denial of qualified immunity to officers who used *more* force to effectuate an arrest than that employed by Officer Jones in the instant case.

Finally, Plaintiff can cite no clearly established case law which would have indicated that Defendant's specific behavior—using pepper spray on an inmate who had repeatedly ignored a jailer's order to stop engaging in a fist fight - violated Plaintiff's constitutional rights.[3] See generally, Willingham v. Loughnan, 321 F. 3d 1299, 1301 (11th Cir. 2003). Certainly, the good faith force used by Officer Jones did not violate clearly established law.

### 3.    Medical Claims

In order to prevail under 42 U.S.C. § 1983 on his medical claim, Plaintiff must demonstrate that Defendants were deliberately indifferent to a serious medical condition. Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." Hudson v. McMillian, 503 U.S. 1, 9 (1992).

> A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. A prison or medical official may be held liable under the Eighth Amendment for actions with "deliberate

---

[3] Other Circuits have analyzed the use of O.C. spray in jail settings. See Stewart v. Stewart, 60 Fed. Appx. 20 (9th Cir. 2003) (prison policy of spraying entire pod areas whenever an individual prisoner acted in a disruptive manner fell within the "wide-ranging zone of deference accorded to prison officials in shaping 'prophylactic or preventive measures intended to reduce the incidence of breaches of prison discipline.'" Id. at 22); Siggers v. Renner, 37 Fed. Appx. 138 (6th Cir.. 2002) (allegations that prison officials used pepper spray to "force his submission to a haircut" did not make out a violation of the Eighth Amendment where he did not sustain a serious injury, the force was needed because of the refusal to obey guards orders, guards reasonably perceived that prisoner's refusal to obey orders was a threat to the security of the prison, and prisoner was allowed to shower and see nurse afterwards); Baldwin v. Stalder, 137 F. 3d 836 (5th Cir. 1998) (Prison guard's actions in using pepper mace to quell inmate disturbance was a good faith effort to maintain or restore discipline and did not constitute excessive force.); Price v. Dixon, 961 F. Supp. 894 (E.D.N.C. 1997) ("[I]it is accepted that prisoners may be subdued with mace when acting disorderly as long as the use is neither excessive nor applied solely for the purpose of inflicting pain or punishment. See Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984), cert. denied, 470 U.S. 1085, 105 S. Ct. 1846, 85 L.Ed.2d 144 (1985); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979). "Mace can be constitutionally used in small quantities to 'prevent riots and escapes' or to control a 'recalcitrant inmate.'" Williams v. Benjamin, 77 F. 3d 756, 763 (4th Cir.1996) (quoting Landman v. Peyton, 370 F. 2d 135, 138 & n.2 (4th Cir.1966), cert. denied, 388 U.S. 920, 87 S. Ct. 2142, 18 L.Ed.2d 1367 (1967)). In fact, "a limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate." Benjamin, 77 F. 3d at 763; Id. at 900).

indifference" to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Mere negligence does not suffice to prove deliberate indifference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994) ("Deliberate indifference describes a state of mind more blameworthy than negligence."). Furthermore, where a prisoner has received medical attention and the dispute concerns the adequacy of the medical treatment, deliberate indifference is not shown. Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985).

In the instant case, the evidence shows that, throughout Plaintiff's incarceration at the Tallapoosa County Jail, he was treated by Cathy Dubose, the Jail Nurse, Dr. Robert Schuster, the Jail Medical doctor, and Dr. Greg Gilbert, an outside medical doctor, for all his medical problems. In fact, Plaintiff was examined and treated at least seventeen times by medical personnel in only five months. In addition, the evidence shows that the problems, of which Plaintiff complains, the injuries sustained in his fight, do not rise to the level of a serious medical need. Even so, after the fight, he was not denied medical care. In fact, Plaintiff was evaluated and treated by Nurse Dubose and Dr. Schuster within a week after the fight occurred. Nurse Dubose had also made an appointment for Plaintiff to see an outside medical doctor for his right hand swelling per Dr. Schuster's orders, but Plaintiff was released from the Tallapoosa County Jail two days later. Clearly, Plaintiff has not shown that Defendants were in any way deliberately indifferent to any serious medical need of the Plaintiff.

An inmate does not have a right to a *specific* kind of treatment. City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 246 (1983) (holding, "the injured detainee's constitutional right is to receive the needed medical treatment; *how [a municipality] obtains such treatment is not a federal constitutional question*") (emphasis added). Furthermore, this Court should not substitute its medically untrained judgment for the professional judgment of the

medical health professionals who treated the Plaintiff.  See Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (observing that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation"); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (stating that the evidence showed the plaintiff received "significant" medical care while in jail, and although plaintiff may have desired different modes of treatment, care provided by jail did not constitute deliberate indifference), cert. denied, 475 U.S. 1096 (1986); Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (stating "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments").

　　　　Furthermore, the Defendants do not have any kind of medical education, training or experience.  They rely upon the professional judgment of medical professionals who have been retained to provide care to the inmates.  While the Eleventh Circuit has not had an opportunity to visit this issue, the Eighth Circuit has addressed a similar claim.  In Meloy v. Bachmeier, 302 F.3d 845 (8th Cir. 2002), a former inmate sued several prison doctors, a nurse, and the prison's medical director[4] for failing to provide him with a positive air pressure machine needed to treat his sleep apnea.  302 F.3d at 847.  Reversing the district court's denial of summary judgment for the director, the Eighth Circuit began by making some common sense observations.  "A prison's medical treatment director who lacks medical expertise cannot be liable for the medical staff's diagnostic decisions."  302 F.3d at 847 citing, Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995).  Further, the Meloy court stated "[p]rison officials cannot substitute their judgment for a medical professional's prescription."  Id. citing, Zentmyer v. Kendall County, 220 F.3d 805, 812 (7th Cir. 2000).  Finally, the court held:

---

[4] The medical director was a trained and licensed nurse.  302 F.3d at 846.

> The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision. Because the law was not clearly established that [the director] was deliberately indifferent to [the plaintiff's] serious medical needs, [the director] is entitled to qualified immunity.

302 F.3d at 849.

In the instant case, the evidence shows that Plaintiff was treated by the Jail Nurse, the Jail Medical doctor, and Dr. Greg Gilbert, an outside medical doctor, for all his medical problems. Defendants, who are not trained and licensed medical providers, are in no way responsible for second-guessing the judgments of nurses and doctors. Therefore, Defendants are entitled to qualified immunity from Plaintiff's claims.

**D.      Plaintiff has failed to allege personal involvement as required by 42 U.S.C. §1983.**

The language of 42 U.S.C. § 1983 requires proof of an affirmative causal connection between the actions taken by the defendants and the constitutional deprivation. Swint v. City of Wadley, 51 F. 3d 988 (11th Cir. 1995). The requisite causal connection may be shown by the personal participation of the defendant, a policy established by the defendant resulting in indifference to constitutional rights or a breach of a duty imposed state of local law which results in constitutional injury. Zatler v. Wainwright, 802 F. 2d 397 (11th Cir. 1986).

**1.      All Plaintiff's claims against Sheriff Jimmy Abbett must fail because he had no personal involvement in the alleged constitutional violation.**

The Plaintiff has failed to allege that Sheriff Abbett was in any way personally involved in any alleged violation of Plaintiff's constitutional rights concerning any of the conditions of his confinement. Plaintiff has offered no allegation demonstrating that this named Defendant was in any way involved in the actions he claims were constitutionally infirm. There are absolutely no facts – in fact, the Complaint is completely devoid of any claim against Sheriff Abbett-- to show

20

that this Defendant personally participated in the claims made the basis of the Plaintiff's Complaint, nor does the Plaintiff allege specifically how this Defendant violated his constitutional rights.  As such, Plaintiff's claims are due to be dismissed against this Defendant.

To the extent that Plaintiff's claim against Sheriff Abbett is an attempt to hold him liable under a *respondeat superior* theory, his claim must similarly fail.

> [Supervisory] liability under § 1983 must be based on something more than a theory of *respondeat superior*.  Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions and the supervising official and the alleged constitutional violation.  The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged depravation, and he fails to do so.

Dolihite v. Maughon, 74 F.3d 1027, 1052 (11th Cir. 1996).  There are absolutely no facts that show a causal connection between any action of Sheriff Abbett and the alleged constitutional violation.  Therefore, Plaintiff's claims against Defendant Abbett are due to be dismissed.

## 2.    All claims against Orlando Jones must fail because he had no personal involvement in the alleged constitutional violation.

The Plaintiff has failed to allege that Orlando Jones was in any way personally involved in the alleged violations of Plaintiff's constitutional rights concerning (1) medical care and treatment or (2) assigning him to a cell with inmate JaMichael Hart with knowledge that there had been a prior altercation between them.  Plaintiff has offered no allegation demonstrating that Orlando Jones was in any way involved in the actions he claims were constitutionally infirm with regard to medical care.  Further, Plaintiff does not allege that Orlando Jones knew that Plaintiff and JaMichael Hart had had an altercation prior to the fight on April 28, 2005.  Plaintiff's only allegation against Officer Jones is that he sprayed him while he was fighting with Hart.  There are absolutely no facts in the Complaint to show that Orlando Jones violated Plaintiff's constitutional rights.  As such, Plaintiff's claims are due to be dismissed against Orlando Jones.

**E.    Plaintiff has not met the prerequisites and requirements under Rule 23 (a) and (b) of the Federal Rules of Civil Procedure for Filing a Class Action.**

The perquisites under Rule 23(a) of the Federal Rules of Civil Procedure for filing a class action are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

> Under Rule 23(b) the following additional requirements must be shown:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Plaintiff has not met any of the above prerequisites and requirements.  In fact, Plaintiff has not even identified any other like plaintiffs.  Therefore, Plaintiff's request to file a class action lawsuit should be denied.

### F.    Summary Judgment Standard

On a motion for summary judgment, the court should view the evidence in the light most favorable to the nonmovant.  <u>Greason</u>, 891 F.2d 829, 831 (11th Cir. 1990).  However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Only reasonable inferences with a foundation in the record inure to the nonmovant's benefit.  <u>See Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" <u>Reeves</u>, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299.[5]  "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'" <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (<u>en banc</u>) quoting <u>Massachusetts School of Law v. American Bar</u>, 142 F.3d 26, 40 (1st Cir. 1998).

## CONCLUSION

Defendants deny each and every allegation made by Plaintiff Duntay Caldwell in the Complaint.  Defendants have not acted in a manner so as to deprive Plaintiff of any right to which he is entitled.

---

[5] Although <u>Reeves</u> was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  <u>Reeves</u>, 530 U.S. at 150, <u>citing</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-251 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

## MOTION FOR SUMMARY JUDGMENT

Defendants respectfully request that this Honorable Court treat their Special Report as a

Motion for Summary Judgment, and grant unto them the same.

Respectfully submitted this 11th day of October, 2005.

> **s/Amanda Kay Morgan Allred**
> KELLY GALLOPS DAVIDSON Bar No. DAV123
> GARY L. WILLFORD, JR. Bar Number: WIL198
> AMANDA KAY MORGAN ALLRED Bar No. ALL079
> Attorneys for Defendants
> WEBB & ELEY, P.C.
> 7475 Halcyon Pointe Drive (36117)
> Post Office Box 240909
> Montgomery, Alabama 36124
> Telephone: (334) 262-1850
> Fax: (334) 262-1889
> E-mail: aallred@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 11th day of October, 2005, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that I have mailed a true and correct copy of the foregoing by United States Mail, postage prepaid, to the following non-CM/ECF participant:

> Duntay Caldwell
> AIS# 176261
> Bullock County Correctional Facility
> P.O. Box 5107
> Union Springs, AL 36089

> **s/Amanda Kay Morgan Allred**
> OF COUNSEL